Juan C Ramon
201 West Riverbend Drive
Sunrise, Fl 33326-2222

April 1, 2020

Honorable Judge Darrin P. Gayles

Wilkie D. Ferguson, Jr. United States Courthouse
400 North Miami Avenue
Room 11-1
Miami, Florida 33128

Re: inmate Juan Carlos Ramon-Iturralde

Register No. 16662-104 / FCI BUTNER LOW

United States

v.

JUAN CARLOS RAMON-ITURRALDE

Case Number 17-20832-Cr /So.Dist Florida

Dear Judge Gayles:

My name is Juan C Ramon JR, I am writing on behalf of my father, Juan C Ramon-Iturralde Register No. 16662-104. At this time, l am respectfully requesting on behalf of my father, Juan Carlos Ramon-Iturralde, that you review all of his medical records to date as well as the court file and take into consideration the current pandemic. As it is to my knowledge an inmate in the prison has tested positive you can imagine my concern for my father's well-being.  The purpose of my request is that this will help you to evaluate his qualifications for a compassionate release home confinement. Also, I want to assure you this not an attempt to avoid serving his sentence; it is a plea to allow a very ill man to be near his family for the remainder of his life.

On September 24, 2018, my father, Juan Carlos Ramon-Iturralde suffered a major, life-threatening and life-changing, cardiac episode. He expired more than once during the attempts to save his life. Fortunately, for the sake of my life as well as my son's and my young brothers lives, his medical team was able to revive him. It has been a difficult journey for him to try to regain some quality of life.

On March 26, 2019, my father, Juan Carlos Ramon-Iturralde, was sentenced to serve a two-year prison sentence to be followed by a year of supervised release. He has never been convicted of a violent *crime* and, any charges relating to violence were misunderstandings that were later dropped, as explained by his attorney. {see attachments} My father is a religious man who, throughout my life, has been known to

everyone as a dependable source of strength for family and friends. The thought that he could find himself alone in a desperate situation and, we could lose him before our arrival is unbearable.

Attached you will find a copy of his most recent medical report (June 2019) prepared by his cardiologist. A copy of the results of the tests ordered by the same doctor is also included. These reports are not in the court file as they were performed after the P.S.I. was completed and filed.

My father's health at the present time is very delicate. According to his medical team, it is crucial to his health to continue the drug therapy and be closely monitored since he suffered severe damage and loss of function to a portion of his heart. Despite whatever legal situations he has found himself in, relating to this case or past misunderstandings, he has always complied with his court obligations.

If he is to be released under whatever conditions the court imposes, he will be residing with me. I am gainfully employed and have been with the same company for over 8 years in a management capacity. Myself, along with the assistance of family and friends, promise to be totally responsible for his medical care and daily needs. Thank you for your time and attention to my father's situation. I look forward to hearing from you soon.

Sincerely,

Juan C Ramon Jr.

Attachments to follow:



**Office of the Attorney General**

**Washington, D. C. 20530**

March 26, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU PRISONS

FROM:        THE ATTORNEY GENERAL

SUBJECT:     Prioritization of Home Confinement As Appropriate in Response to
             COVID-19 Pandemic

Thank you for your tremendous service to our nation during the present crisis. The current situation is challenging for us all, but I have great confidence in the ability of the Bureau of Prisons (BOP) to perform its critical mission during these difficult times. We have some of the best-run prisons in the world and I am confident in our ability to keep inmates in our prisons as safe as possible from the pandemic currently sweeping across the globe. At the same time, there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities. I am issuing this Memorandum to ensure that we utilize home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in our custody.

## I.   TRANSFER OF INMATES TO HOME CONFINEMENT WHERE APPROPRIATE TO DECREASE THE RISKS TO THEIR HEALTH

One of BOP's tools to manage the prison population and keep inmates safe is the ability to grant certain eligible prisoners home confinement in certain circumstances. I am hereby directing you to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic. Many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care. But for some eligible inmates, home confinement might be more effective in protecting their health.

In assessing which inmates should be granted home confinement pursuant to this Memorandum, you are to consider the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

- The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines;

- The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

- The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment under this Memorandum;

- The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;

- Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

- The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.

In addition to considering these factors, before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement. We should not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19. You should grant home confinement only when BOP has determined—based on the totality of the circumstances for each individual inmate—that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

## II.   **PROTECTING THE PUBLIC**

While we have an obligation to protect BOP personnel and the people in BOP custody, we also have an obligation to protect the public. That means we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19, or put the public at risk in other ways. I am therefore directing you to place any inmate to whom you grant home confinement in a mandatory 14-day quarantine period before that inmate is discharged from a BOP facility to home confinement. Inmates transferred to home confinement under this prioritized process should also be subject to location monitoring services and, where a court order is entered, be subject to supervised release.

We must do the best we can to minimize the risk of COVID-19 to those in our custody, while also minimizing the risk to the public. I thank you for your service to the country and assistance in implementing this Memorandum.

# Florida

## DRIVER LICENSE

USA

R550-423-86-410-0

9 CLASS E



1 RAMON
2 JUAN CARLOS, JR.
8 201 N LEWIS AVENUE
FLRIDGE FL

3 DOB 11/10/1966    15 SEX M
4b EXP                 16 HGT 5'-06"
12 REST NONE    9a END NONE



4a ISS
5 DD X63

REPLACED

Operation of a motor vehicle constitutes
consent to any sobriety test required by law.

# Results

ECHO (Order 1287611371)

## Patient Info

| Patient Name | Sex | DOB |
|---|---|---|
| Ramon, Juan (5083702) | Male | 08/30/1959 |

## 6/13/2019  4:34 PM – Cchs, Sdynamics Oru In

## Results

Echocardiography Report: Transthoracic Echo
Weston Clinic
Date of service: 6/13/2019 3:11:47 PM
Accession #: 156753^SDW

Ordering physician: DAVID G WOLINSKY and DR. WOLINSKY
Indication: Ischemic cardiomyopathy [I25.5] .

Technologist: Amy Jimenez RDCS
Interpreting physician: Craig Asher MD

PATIENT:
Name: JUAN RAMON
MRN: 5083702
DOB: 8/30/1959
Age: 59 years
Gender: M

Primary rhythm: sinus.
Height: 175.30 cm BSA: 2.16 m²
Weight: 95.57 kg  BMI: 31.1 kg/m²

Heart rate     87 bpm
Blood pressure 97/72 mmHg

Color Doppler was utilized to interrogate the cardiac valves assessed and spectral
 Doppler was utilized to determine the flow velocities and pressure gradients
reported in this exam.

MEASUREMENTS:

|  | Value | Indexed | Normal |
|---|---|---|---|

| Left atrium diameter | 4.1 cm (2D) | | LAd < 4 |
| LV ID (diastole) | 6.3 cm (2D) | | |
| LV ID (systole) | 5.3 cm (2D) | | |
| IVS, leaflet tips | 0.6 cm (2D) | | |
| Posterior wall thickness | 0.6 cm (2D) | | |
| Left ventricular mass | 144 g (2D) | 67 g/m² | |
| LV stroke volume | 55 ml (2D biplane) | | |
| LV end diastolic volume | 162 ml (2D biplane) | 75.0 ml/m² | 34<=EDVi<75 |
| LV end systolic volume | 107 ml (2D biplane) | 49.6 ml/m² | |
| Ejection Fraction | 34 % (2D biplane) | | EF > 52 |

FINDINGS:

LEFT VENTRICLE
The left ventricle is dilated.
Left ventricular systolic function is moderately decreased regionally.
Grade III left ventricular diastolic dysfunction. The findings are consistent with
 elevated mean LAP and LVEDP.
Mitral annular lateral E/e': 34.5. Mitral annular septal E/e': 15.8.
Wall Motion:
The mid and distal anterior wall, entire septum, and entire apex are akinetic. The
 inferior wall is mildly hypokinetic. All remaining scored segments are normal.

RIGHT VENTRICLE
The right ventricle is normal in size.
Pacer wires are noted in the right ventricle.
Right ventricular systolic function is normal. RV systolic tissue Doppler velocity
 is 11.4 cm/s.
Estimated right ventricular systolic pressure is 45 mmHg consistent with mild
pulmonary hypertension. Estimated right atrial pressure is 3 mmHg based on IVC
assessment.

LEFT ATRIUM
The left atrial cavity is dilated.

RIGHT ATRIUM
The right atrial cavity is normal in size. Pacer wires are noted in the right
atrium.
Inferior Vena Cava:

The inferior vena cava appears normal measuring 2.0 cm. The vessel decreases
greater than 50 percent with inspiration.

MITRAL VALVE
The mitral valve leaflets are structurally normal. There is mild (1+) mitral valve
 regurgitation. Regurgitant orifice area (PISA) is 0.18 cm². The pressure half
time is 41 msec. The peak mitral E/A ratio is 1.64. The average mitral E/e' ratio
is 25.1. The mitral flow deceleration time is 141 msec.

TRICUSPID VALVE
The tricuspid valve leaflets are structurally normal. There is mild (1+) tricuspid
 valve regurgitation.

AORTIC VALVE
There is no aortic valve stenosis. There is trace aortic valve regurgitation.
Tricuspid aortic valve.

PULMONIC VALVE
There is no pulmonic stenosis. There is trace pulmonic valve regurgitation.

PULMONARY ARTERIES
The pulmonary arteries are normal.

INTERATRIAL SEPTUM
There is a patent foramen ovale as detected by Doppler.

PERICARDIUM
There is no pericardial effusion.

CONCLUSIONS:
- Exam indication: Ischemic cardiomyopathy [I25.5] .
- There is a resting wall motion abnormality in the territory of the LAD.
- The left ventricle is dilated. Left ventricular systolic function is moderately
decreased. EF = 34 ± 5% (2D biplane) Grade III left ventricular diastolic dysfunction.
- The right ventricle is normal in size. Right ventricular systolic function is
normal.
- The left atrial cavity is dilated.
- There is a patent foramen ovale as detected by Doppler.
- There are no significant valvular abnormalities.
- Exam was compared with the prior CC echocardiographic exam performed on

3/19/2019 - there are no significant changes.


Electronically signed by Craig Asher MD on 6/13/2019 at 4:34:04 PM


*** Final ***

## Results-Findings

See Link below for Image

## Results Interpreter

Asher, Craig

## Result Information

| Status | Provider Status |
| --- | --- |
| Final result (6/13/2019  4:34 PM) | Reviewed |

## Exam Performed

Date and Time
06/13/2019  3:11 PM

## Resulting Agency

CLEVELAND CLINIC FLORIDA LAB
3100 Cleveland Clinic Blvd
Weston FL 33331

## Result Notes for ECHO

Notes recorded by David G Wolinsky on 6/14/2019 at 12:20 AM EDT
Call patients son
Tell him echo is unchanged but what I wrote in my note  Is more significant

Send both to son and to lawyer

## Cardiology Images

Get Cardiology Images

## Patient Release Status:

This result is not viewable by the patient.

# Recipient List for Orders

| Sent | From | To | Cc'd | Forwarded To | Results |
| --- | --- | --- | --- | --- | --- |
| 6/13/2019 4:34 PM | Cchs, Sdynamics Oru In | David G Wolinsky | | | ECHO [1287611371] |

Ramon, Juan (MR# 5083702)

## Routing History

| Priority | Sent On | From | To | Message Type |
|---|---|---|---|---|
| | 6/14/2019 12:20 AM | David G Wolinsky | Nichole Sammy | Result Notes |
| | 6/13/2019 4:34 PM | Cchs, Sdynamics Oru In | David G Wolinsky | Results |

## Order Report

Order Details

# Ramon, Juan

MRN: 5083702

**Office Visit FLA** 6/10/2019   Provider: David G Wolinsky (Cardiology)
Cardiology                 Primary diagnosis: Ischemic cardiomyopathy
                           Reason for Visit: CARD Follow Up 3 Month; Referred by David G Wolinsky

## Progress Notes

David G Wolinsky (Physician) • Cardiology

**CHIEF COMPLAINTS:** Patient presents with:
CARD Follow Up 3 Month

Juan Ramon is a 59 year old male here today for follow-up of ischemic myopathy

Anterior wall STEMI September 2018. Successful early PCI.–2 drug-eluting stent
EF 35%.
Postoperative hypotension.
Post MI complete heart block with cardiac arrest requiring pacemaker per minute

Postural dizziness and lightheadedness. Blood pressure in the 90s. Trying to exercise.
Defibrillator has not discharged. No edema.

Compliant with diet instructions, compliant with exercise instructions, no bleeding or bruising
and no major medicine side effects.

**PAST MEDICAL HISTORY:**

**PAST MEDICAL HISTORY**

| Diagnosis | Date |
|---|---|
| • AICD (automatic cardioverter/defibrillator) present *Boston Scientific* | 09/26/2018 |
| • Cardiac pacemaker *Boston Scientific* | 09/26/2018 |
| • Hypertension | |
| • Occlusion of coronary artery stent *LAD* | 09/24/2018 |
| • S/P drug eluting coronary stent placement | 09/24/2018 |
| • STEMI (ST elevation myocardial infarction) (HCC) | 09/24/2018 |

**PAST SOCIAL HISTORY:**

**PAST SURGICAL HISTORY**

| Procedure | Laterality | Date |
|---|---|---|
| • AICD - OTHER/BI-V | | |

**SOCIAL HISTORY:**

Social History
   Socioeconomic History

Marital status: Married
Spouse name: Not on file
Number of children: Not on file
Years of education: Not on file
Highest education level: Not on file
Social Needs
Financial resource strain: Not on file
Food insecurity – worry: Not on file
Food insecurity – inability: Not on file
Transportation needs - medical: Not on file
Transportation needs – non-medical: Not on file
Occupational History
Occupation: Jewery store
Tobacco Use
Smoking status: Never Smoker
Smokeless tobacco: Never Used
Substance and Sexual Activity
Alcohol use: No
Drug use: No
Sexual activity: Not on file
Other Topics
Concerns:
Not on file
Social History Narrative
Not on file


**FAMILY HISTORY:**

No family history on file.

**ALLERGIES:**

Patient has no known allergies.

**CURRENT MEDICATIONS:**

**Current Outpatient Medications**

| Medication | Sig | Dispense | Refill |
|---|---|---|---|
| • atorvastatin (LIPITOR) 40 mg tablet | Take 1 tablet by mouth daily at bedtime. | 90 tablet | 3 |
| • metoprolol succinate ER (TOPROL XL) 50 mg 24 hr tablet | Take 0.5 tablets by mouth once daily. | | |
| • ENTRESTO 24-26 mg tablet | TAKE 1 TABLET BY MOUTH TWICE DAILY | 180 tablet | 1 |
| • nitroglycerin sublingual (NITROQUICK) 0.3 mg SL tablet | Dissolve 1 tablet under the tongue every 5 minutes as needed. | 30 tablet | 0 |
| • aspirin 81 mg chewable tablet | Take 1 tablet by mouth once daily. | 30 tablet | 11 |
| • clopidogrel (PLAVIX) 75 mg tablet | Take 1 tablet by mouth once daily. | 30 tablet | 11 |

- perflutren lipid microspheres (DEFINITY) 1.1 mg/mL injection (to be provided with echo procedure)  Inject 1.3 mL intravenously as directed.  1.3 mL  0

No current facility-administered medications for this visit.

## REVIEW OF SYSTEMS:

**GENERAL:** Negative for fatigue, significant weight gain and weakness
**EYES:** No new visual disturbances
**ENT:** No trouble swallowing, no allergic symptoms, no sinus problems
**RESPIRATORY:** Negative for cough, sputum, loud snoring or witnessed apneas
**GI:** Negative for nausea, vomiting, diarrhea, constipation or abdominal pain.
**MUSCULOSKELETAL:** Negative for joint pains, joint swelling, muscle cramps and fatigue
**GENITAL/URINARY:** Denies
**SKIN:** Negative for rashes or lesions
**PSYCH:** Negative for depression or anxiety
**HEMATOLOGY/LYMPHOLOGY:** Negative for prolonged bleeding, bruising easily or swollen nodes
**ENDOCRINE:** Negative for heat or cold intolerance, history of thyroid disease and excessive sweating.
**NEURO:** Negative for headaches, or focal motor or sensory loss.
**CONSTITUTIONAL:** No fevers, chills or excess unintentional weight change
The remainder of the review of systems is negative

## PHYSICAL EXAM:
BP 97/72 | Pulse 84 | Ht 175.3 cm (5' 9") | Wt 95.6 kg (210 lb 11.2 oz) | SpO2 96% | BMI 31.11 kg/m² Body mass index is 31.11 kg/m².

**GENERAL:** Alert, oriented., well appearing. No jaundice, anemia, clubbing, or cyanosis. No distress
**SKIN:** No rashes, no bruises, no lesions
**HEAD:** Normocephalic, no masses, lesions, tenderness or abnormalities
**EYES:** Perrla. Sclera clear conjuctiva normalWNL
**THROAT:** Normal
**NECK:** Supple, No adenopathy , masses or thyromegaly
NO JVD or HJR.
**CAROTIDS:** Good carotid upstrokes. No carotid bruit
No lymphadenopathy
**LUNGS:** Clear to auscultation anterior and posterior
**CARDIAC:** Regular rate and rhythm. PMI normal, normal S1, S2 no murmur.
**ABDOMEN:** Soft, non-tender, with no obvious organomegaly or masses. No epigastric bruit. Aorta not palpable
**EXTREMITIES:** No edema. No clubbing or cyanosis
**PERIPHERAL PULSES:** 2+ equal symmetric
**NEUROLOGICAL:** Grossly normal
**MUSCULOSKELETAL:** No mechanical aids. Normal gait

**EKG:**

**RECENT CARDIAC TESTS:**

**Echo:**

**Stress Test:**

**Holter:**

**Other:**

**LABS:**

**Glucose (mg/dL)**

| Date | Value |
|------|-------|
| 10/22/2018 | 101 |

**Potassium (mmol/L)**

| Date | Value |
|------|-------|
| 10/22/2018 | 4.3 |

**Sodium (mmol/L)**

| Date | Value |
|------|-------|
| 10/22/2018 | 142 |

**Chloride (mmol/L)**

| Date | Value |
|------|-------|
| 10/22/2018 | 109 |

**CO2 (mmol/L)**

| Date | Value |
|------|-------|
| 10/22/2018 | 27 |

**Creatinine (mg/dL)**

| Date | Value |
|------|-------|
| 10/22/2018 | 1.14 |

**BUN (mg/dL)**

| Date | Value |
|------|-------|
| 10/22/2018 | 17 |

**Anion Gap (mmol/L)**

| Date | Value |
|------|-------|
| 10/01/2018 | 12 |

**Calcium (mg/dL)**

| Date | Value |
|------|-------|
| 10/22/2018 | 9.1 |

**Protein, Total (g/dL)**

| Date | Value |
|------|-------|
| 10/01/2018 | 7.2 |

**Albumin (g/dL)**

| Date | Value |
|------|-------|

10/01/2018          3.6

**Bilirubin, Total (mg/dL)**
Date                 Value
10/01/2018          0.7

**Alkaline Phosphatase (U/L)**
Date                 Value
10/01/2018          65

**AST (U/L)**
Date                 Value
10/01/2018          35

**ALT (U/L)**
Date                 Value
10/01/2018          39

**Hemoglobin (g/dL)**
Date                 Value
10/01/2018          13.8

**Hematocrit (%)**
Date                 Value
10/01/2018          39.8

**WBC (k/uL)**
Date                 Value
10/01/2018          12.18

**Cholesterol, Total (mg/dL)**
Date                 Value
09/24/2018          225

**HDL Cholesterol (mg/dL)**
Date                 Value
09/24/2018          73

**LDL Cholesterol (mg/dL)**
Date                 Value
09/24/2018          135

**Triglyceride (mg/dL)**
Date                 Value
09/24/2018          84

No results found for: T3
No results found for: T4
No results found for: T4UPTAKE
No results found for: TSH
**CK (U/L)**
Date                 Value

09/25/2018            2,297

**ASSESSMENT AND PLAN:**
**Ischemic cardiomyopathy  (primary encounter diagnosis)**
**Old mi (myocardial infarction)**
**Chb (complete heart block) (hcc)**
**Pure hypercholesterolemia**
**Pacemaker**

**Disturbed by his hypotension and his inability to tolerate increased doses of medications which will improve ventricular remodeling. We will continue low dose Entresto twice a day. Reduce Toprol 25 mg once a day in the middle of the day. He will need careful and frequent drug titration by a skilled cardiologist. Recheck echo**

Discussed health maintenance and encouraged patient to follow a heart healthy lifestyle with low fat diet, regular activity and no more than mild alcohol use.
It was a  pleasure to participate in his care. Patient instructed to call if he has any questions, any new or change in symptoms.

**David G. Wolinsky, M.D., F.A.C.C., F.A.S.N.C.**

This note may have been created using computerized transcription software and may therefore include some transcription errors.

CC:  Moises A Issa, MD (DrC)
2488 N UNIVERSITY DR
STE 101
Hollywood, FL 33024
Phone: 954-983-9191
Fax: 954-983-1152

## Instructions

Return in about 2 months (around 8/10/2019).

continue entresto

Take toproll 25 mg ( half pill)   once   day

FLA WES SCHEDULER WORK SHEET - HTML (Printed 6/10/2019), After Visit Summary (Printed 6/10/2019)

## Additional Documentation

| Vitals: | BP 97/72 Pulse 84 Ht 175.3 cm (5' 9") Wt 95.6 kg (210 lb 11.2 oz) SpO2 96% BMI 31.11 kg/m² BSA 2.16 m² |
| --- | --- |
| Flowsheets: | CCHS PDMP NARXCARE SCORES, AMB ROOMING INTAKE MINI |
| Encounter Info: | Billing Info, History, Allergies, Detailed Report |

## Communications

 Letter sent to Moises A Issa, MD
Sent 6/11/2019

Ramon, Juan (MRN 3083782) DOB: 3/3/1959

## Orders Placed

COMP METABOLIC PANEL (Resulted 6/11/2019)
COMPLETE BLOOD COUNT W/AUTO DIFF (Resulted 6/11/2019)
BILIRUBIN DIRECT BLD
COMP METABOLIC PANEL
COMPLETE BLOOD COUNT W/AUTO DIFF
ECHO (Resulted 6/13/2019)

## Medication Changes

As of 6/10/2019 2:52 PM

| | Refills | Start Date | End Date |
|---|---|---|---|
| Added: perflutren lipid microspheres (DEFINITY) 1.1 mg/mL injection (to be provided with echo procedure) | 0 | 6/10/2019 | 7/5/2019 |
| Inject 1.3 mL intravenously as directed. – INTRAVENOUS | | | |
| Changed: metoprolol succinate ER (TOPROL XL) 50 mg 24 hr tablet | | 6/10/2019 | |
| Take 0.5 tablets by mouth once daily. – ORAL | | | |
| Previously: 25 mg ORAL 2 TIMES DAILY | | | |

## Visit Diagnoses

Ischemic cardiomyopathy I25.5
Old MI (myocardial infarction) I25.2
CHB (complete heart block) (HCC) I44.2
Pure hypercholesterolemia E78.00
Pacemaker Z95.0

Case 1:17-cr-20832-DPG Document 71 Entered on FLSD Docket 04/08/2020 Page 18 of 25

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### CASE NO. 1:17-cr-20832-DPG

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

  JUAN CARLOS RAMON ITURRALDE

        Defendant.

_____/

## NOTICE OF COUNSELS INTENT TO MOVE THE
## THE COURT AT SENTENCING TO HAVE DEFENDANT'S MEDICAL RECORDS
## ATTACHED TO THE PRE SENTENCE INVESTIGATION

Defendant through counsel respectfully files this notice of intent to request that the Court permit the attachment of his medical records to the Pre Sentence Investigation. In support counsel states,

1.     During the pendency of this case Juan Carlos Ramon suffered a massive heart attack. In the course of the medical intervention at the Cleveland Clinic he died three times on the operating table and was miraculously revived. The surgeon subsequently remarked to Mr. Ramon, that in his experience none had ever survived an event so severe.

2.     At this point his heart is functioning at somewhat over 33 percent, the rest of his heart does not function.

3.     This request to attach the medical records is to immediately advice and make aware the severity of his condition to both the designation staff and the medical staff of the Bureau of Prisons.

4.   Both entities have to be immediately aware that should another episode take place that per the medical records if there is no immediate intervention Juan Carlos Ramon will die before he can be transported to a local heart specialty center.

5.   That is, his situation will require special monitoring of his condition, and emergency treatment on an expedited basis otherwise his chances of survival are nil. It is counsels understanding that heart related emergency treatment cannot be performed at Federal Medical Facilities.

6.   To avoid delay in requesting and receiving the records their attachment to the PSI will permit the Bureau of Prisons to not only make a designation to a Medical facility but also enable them to act immediately on any episode that may take place.

7.   Counsel has given a copy of the full medical records and an Echocardiography Report performed on 03/19/2019 to the probation officer to be able to effectuate this request should the Court grant it.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on January 26, 2018, I electronically filed the foregoing document with the Clerk of Court, Southern District of Florida, using **CM/ECF,** and all parties not subject to electronic notification.

Respectfully submitted,

*/S/ ALBERTO F. SARASUA*

_____

ALBERTO F. SARASUA, Esq.
442 Hampton Lane, Key Biscayne
Florida 33149-1853 Fla.Bar No. 363146
305.361.7480   fx. 305.361.8537
afsarasuakiko@yahoo.com

Case 1:17-cr-20832-DPG Document 57 Entered on FLSD Docket 02/13/2019 Page 1 of 3

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### CASE NO. 1:17CR20832/GAYLES

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

                                   ***DEFENDANT'S 1ˢᵀ OBJECTIONS/CHANGES TO PRE-SENTENCE INVESTIGATION***

JUAN CARLOS RAMON-ITURRALDE,

        Defendant,

_____/

Defendant through counsel hereby files his objections/changes/comments to the Pre-Sentence Investigation.

## Adult Criminal Convictions

1.     Page(s) 9, paragraph(s) 22.

     The arrest was effectuated by the "Miami River Cops." He did not run away. He was in the back yard of the home. He was asked to come out which he did. At one point he had to go over a fence. Before he was able to come down from the fence he was pulled down causing some gashes on his legs from the steel prongs above. Once on the ground he was beaten followed by then obligatory dog bite.

## Other Criminal Conduct

2.     Page(s) 12, paragraph(s) 31.

     This incident was defended by counsel on this case. Pursuant to counsel's request all efforts to arrest Juan Carlos were stopped. He was then able to appear at the State Attorney's Office with several witnesses as to the events.

     The altercation began when his then wife tried to shoot him with a 9mm pistol. Luckily the gun jammed and it would not function. At that time Juan Carlos quickly left the premises and headed for his parked car followed by his spouse at this time armed with a stick. As he was attempting to start the car his wife was beating the car with the stick. Juan Carlos mother, then 75 years old, who lived across the street came over to attempt to calm things down. The wife, who outweighed her by at least 40 pounds, knocked her to the ground. At that time Juan Carlos came out of his car and to protect his mother knocked the then wife to

the ground. He re entered his car and took off knowing that the wife had contacted the local constabulary who's norm was to arrest the male first and ask questions later.

Luckily for Juan Carlos, not only did his mother serve as a witness to the event, but several neighbors who had ringside seats, appeared before the Assistant State Attorneys on the case and gave a factual version of the events that dramatically differed from the victims.

The case was no actioned as a result. When the State asked if he would press charges for the false accusation, Juan Carlos declined because she was his sons mother.

3.  Page(s) 12, paragraph(s) 32.

This was a reprise of the events on paragraph 31(without the firearm). The State was asked to review the findings of the Assistants on the prior case, showing perjury and the case was Nolle Prossed. The State did not find a need to interview the defense witnesses.

4.  Page(s) 12, paragraph(s) 33.

In this case the property had an owner and a caretaker. The house was to be forfeited to the federal government. The owner told Juan Carlos that he could go in the yard and take whatever he thought useful and give him some money for it. The caretaker was unaware of the arrangement. By the next court date the caretaker was informed by the owner of the arrangement and the case was no actioned.

**Employment Record**

5.  Page(s) 16, paragraph(s) 59.

Juan Carlos was unemployed because he had suffered a major heart attack which left one third to one half of his heart tissue dead.

Case 1:17-cr-20832-BPG Document 71 Entered on FLSD Docket 04/08/2020 Page 22 of 25

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on February 13, 2019, I electronically filed the foregoing document with the Clerk of Court, Southern District of Florida, using **CM/ECF,** and all parties not subject to electronic notification.

Respectfully submitted,

/S/ ALBERTO F. SARASUA

_____

ALBERTO F. SARASUA, Esq.
442 Hampton Lane, Key Biscayne
Florida  33149-1853 Fla.Bar No. 363146
305.361.7480   fx. 305.361.8537
afsarasuakiko@yahoo.com

## CASE INFORMATION

Court Case No.: F02031302      State Case No.: 132002CF0313020001XX

Name: RAMON, JUAN C      Date of Birth: 08/30/1960

Date Filed: 10/22/2002      Date Closed: 12/02/2002      Warrant Type:

Assessment Amount: $0.00      Balance Due: $0.00      Stay Due Date:

Hearing Date:      Hearing Time:      Hearing Type:

Court Room: REGJB - JUSTICE BUILDING, ROOM No.: 6-2

Address: 1351 N.W. 12 ST

Previous Case:      Next Case:

Judge: FERNANDEZ-KARAVETSOS, MARLENE      Defense Attorney:

Bfile Section: F002      File Location: DESTROYED      Box Number:

## CHARGES

| Seq No. | Charge | Charge Type | Disposition |
|---------|--------|-------------|-------------|
| 1 | BURGLARY/UNOCC/DWELL | FELONY | NO ACTION |
| 2 | PETIT THEFT | MISDEMEANOR | NO ACTION |

## DOCKETS

| Seq. No. | Date | Book/Page | Docket |
|----------|------|-----------|--------|
| 14 | 12/03/2002 | | DISCHARGE CERTIFICATE ISSUED P7500350630 |
| 13 | 12/02/2002 | | CLOSING JUDGE SIGLER, VICTORIA S |
| 12 | 12/02/2002 | | AMT/ 8000 DISCHARGED 12/02/2002 POWER/P7500350630 |
| 10 | 11/21/2002 | | ARRAIGNMENT HEARING SCHEDULED FOR 12/02/2002 AT 09:00 |
| 8 | 11/12/2002 | | ARRAIGNMENT HEARING SCHEDULED FOR 11/21/2002 AT 09:00 |
| 7 | 10/30/2002 | | INTAKE UNIT ASSIGNED: FSU - CASE SCREENING |
| 6 | 10/30/2002 | | INTAKE PROS. ASSIGNED: PORTMAN, ERROL |
| 5 | 10/22/2002 | | BOND RECEIVED P7500350630 |
| 4 | 10/22/2002 | | AMT/ 8000 ISSUED 10/21/2002 POWER/P7500350630 |
| 1 | 10/21/2002 | | ARRAIGNMENT HEARING SCHEDULED FOR 11/12/2002 AT 09:00 |

## CASE INFORMATION

Court Case No.: M92065626   State Case No.: 131992CO065626260001XX

Name: RAMON, JUAN CARLOS                                    Date of Birth: 08/30/1959

Date Filed: 05/12/1992        Date Closed: 09/17/1992   Warrant Type:

Hearing Date:                 Hearing Time:             Hearing Type:

Court Room: REGJB – JUSTICE BUILDING, ROOM No.: 4-10

Address: 1351 N.W. 12 ST

Previous Case:                Next Case:

Judge: ALVAREZ-ZANE BETSY   Defense Attorney:

Bfile Section: M004          File Location: DESTROYED   Box Number:

## CHARGES

| Seq No. | Charge | Charge Type | Disposition |
|---|---|---|---|
| 1 | ASSAULT AND BATTERY | COUNTY ORDINANCE | NOLLE PROS |

## DOCKETS:

| Seq. No. | Date | Book/Page | Docket |
|---|---|---|---|
| 26 | 01/26/1993 | | ORDER SETTING ASIDE BOND ESTREATURE |
| 25 | 01/26/1993 | | CAB AMT/ 500 DISCHARGED 01/26/1993 POWER/4776530000 |
| 24 | 01/26/1993 | | CAB AMT/ 500 VACATED 01/26/1993 POWER/4776530000 |
| 23 | 01/07/1993 | | MOTION TO SET ASIDE BOND ESTREATURE FILED 01/07/1993 SET FOR 01/26/1993 AT 09:00 |
| 22 | 09/18/1992 | | AMT/ 500 DISCHARGED 09/17/1992 POWER/IB20567800 |
| 21 | 09/17/1992 | | CLOSING JUDGE OPPENBORN, HENRY L |
| 20 | 09/14/1992 | | SUBPOENA FOR TRIAL - RETURNED CHARLES FERRANTE |
| 19 | 09/14/1992 | | SUBPOENA FOR TRIAL - RETURNED ALEJANDRO CELAYA |
| 18 | 09/14/1992 | | SUBPOENA FOR TRIAL - RETURNED RANDY GREENBERG |
| 16 | 09/02/1992 | | TRIAL HEARING SCHEDULED FOR 09/17/1992 AT 10:00 |
| 14 | 08/14/1992 | | TRIAL HEARING SCHEDULED FOR 08/27/1992 AT 10:00 |
| 11 | 07/17/1992 | | REPORT RE: STATUS SET FOR 08/14/1992 AT 09:00 |
| 9 | 06/25/1992 | | ARRAIGNMENT HEARING SCHEDULED FOR 07/16/1992 AT 09:00 |
| 3 | 06/24/1992 | | NOTICE OF APPEARANCE AND PLEA |
| 8 | 06/12/1992 | | CAB AMT/ 500 ESTREATED 06/12/1992 POWER/4776530000 |
| 7 | 05/14/1992 | | ARRAIGNMENT HEARING SCHEDULED FOR 06/12/1992 AT 09:00 |
| 6 | 05/12/1992 | | JUDGE OPPENBORN, HENRY L ASSIGNED-SECTION M004 |



Juan C Ramon
376 Fairway Cir
Weston, FL 33326

CERTIFIED MAIL

7019 0160 0000 0561 8185

U.S. POSTAGE PAID
FCM LG ENV
WESTON, FL
33326
APR 03, 20
AMOUNT

$5.35
R2305E124370-06

1020        33128

Honorable Judge Darrin P. Gayles
Wilkie D. Ferguson, Jr. United States
Courthouse
400 N Miami Avenue Room 11-1
Miami FL 33128